EMIL C. HAGE, Thomas Lonnevik, and Siver Serumgard, as the Lake Region Investment Company, Respondents, v. M. SIGBERT AWES COMPANY, a Corporation, Appellant.

(179 N. W. 986.)

**Brokers — one broker held not liable to another under contract between them as to sale of land listed with latter.**

This is an appeal from a judgment on a verdict for $813. The complaint does not state and the evidence does not show a cause of action, but there is a clear showing that the plaintiff has no cause of action.

Opinion filed June 25, 1920.   On rehearing November 6, 1920.

Appeal from the District Court of Ramsey County; Honorable A. G. Burr, Judge.

Reversed and dismissed.

Flynn, Traynor & Traynor, for appellant.

The plaintiffs are not entitled to recover because they did not and could not deliver to defendant on the terms agreed.

Under these circumstances plaintiff had nothing to sell to defendant and they knew it. That such a contract is void and no compensation or commission can be recovered by the broker under such circumstances. Halland v. Johnson (N. D.) 174 N. W. 874.

The failure of the plaintiffs to deliver to the defendant at $25 per acre defeats the right of plaintiffs to recover their commission. This is clearly the law in this state. Anderson v. Johnson, 16 N. D. 174, 112 N. W. 139; Paulson v. Reeds, 33 N. D. 152; Grangaard v. Betzina, 33 N. D. 271; Fulton v. Cretain, 17 N. D. 335.

*Serumgard & Conant,* for respondents.

ROBINSON, J. This is an appeal from a judgment on a verdict for $813. The gist of the complaint is that in 1916, at Devils Lake, in Ramsey county, both the plaintiff and the defendant were engaged in the business of buying and selling land on their own account and on commission. That 680 acres of land—described in the complaint—had been listed with the plaintiff for sale on commission, and that in April, 1916, it was agreed between the plaintiff and defendant that if the defendant bought or took over any of the land contained in the plaintiffs' list of land for sale on commission, the defendant would pay to the plaintiff a commission of $1 per acre for the land bought or taken over; that on August 21, 1916, the defendant bought and took over said 680 acres.

It appears that in 1915 the defendant had desk room in the office of Siver Serumgard and had the same land listed for sale. Then in 1916 the plaintiffs formed their corporation to sell and deal in lands, and the land was listed with them for sale at $25 an acre. It was also listed with the defendant. The land was part of an estate. It was listed by the executrix, who had no authority to list it for sale at any price. In time the land was advertised for sale at auction, pursuant to an order of the court, and at the auction sale the plaintiff bid for the land $25.92 per acre; defendant bid $26.06 per acre and the land was sold and conveyed to defendant.

The complaint does not state a cause of action; the evidence does not show a cause of action. On the contrary, the complaint and the evidence show that plaintiff has no cause of action. The executrix did not own the land. She had no legal authority to list it for sale at $25

an acre, or at any price, and at the public sale of the land, which was duly advertised and made pursuant to an order of the court, the plaintiff and the defendant and every other person had a perfect right to bid for the land without paying for the privilege $1 an acre, or any sum whatever. As the writer thinks, there was no reasonable cause for commencing and prosecuting such an action.

Reversed and dismissed.

BIRDZELL and GRACE, JJ., concur.

CHRISTIANSON, Ch. J. (dissenting). The majority members not only reverse the judgment, but order a dismissal of the action. That is, they hold as a matter of law that plaintiffs have no cause of action. I am unable to agree with these conclusions.

The evidence adduced by the plaintiffs shows that the defendant had been maintaining an office at Devils Lake. In 1916, Awes, the principal officer of the defendant corporation approached plaintiffs and stated, in substance, that he wanted to enter into a working agreement with them, whereby his corporation would have the benefit of and handle lands which had been listed with the plaintiffs; that if such arrangement was made defendant would not keep a man at Devils Lake, and would pay plaintiffs $1 per acre for all the land which it acquired or disposed of from such lists. This proposition was accepted by the plaintiffs. At the time, the plaintiffs had upon their lists, among others, 680 acres belonging to the Mooers's estate. The surviving widow, Elizabeth W. Mooers, who was administratrix of the estate had listed the land for sale with the plaintiffs at a price of $25 per acre net to the owners. The plaintiffs informed Awes of this fact, and gave him the memorandum relative thereto which they had in their files. Thereafter one of the members of the plaintiff copartnership took Awes out to inspect the land. Later, Serumgard, one of the members of the plaintiff copartnership had a conversation with the administratrix relative to the sale of the land which she had listed with them. He explained to her that it would be necessary to have the sale made through proceedings had in the probate court. She stated that she did not want to go to this trouble and expense unless she was sure the land could be sold. Serumgard thereupon assured

her that he would see that the land was purchased at a price to net the owners at least $25 per acre. He thereupon prepared, and the administratrix signed and verified, a petition for license to sell such real estate; and later sale was held pursuant thereto. In accordance with his promise to the administratrix, Serumgard submitted a bid for the land in the sum of $17,666.15, or about $25.97 per acre. The defendant company, also, submitted a bid of $26.06 per acre, and was awarded the land. At the time he submitted his bid, Serumgard had no knowledge that the defendant had made, or was intending to make, a bid for the land. The testimony of Lonnevik, one of the copartners, shows that at a later date Awes recognized that his company was indebted to the plaintiff in connection with the acquisition by his company of the land in question.

The majority opinion is predicated upon the proposition that the administratrix had no authority to sell or list the land for sale at any price. It is true she could not sell it, or enter into any valid contract to sell, except in the manner provided by law for the sale of such property. There was no reason, however, why, before putting the estate to the expense of obtaining license to sell and advertising the sale, she should not endeavor to interest prospective purchasers. I do not see, however, wherein the validity of the listing arrangement between the plaintiffs and the administratrix makes any difference as to the respective rights of the parties to this action. The arrangement between the plaintiffs and the defendant was that it would pay $1 per acre for land which it "took" from their list. It was in effect an agreement to pay for service or information leading to the purchase of land. Plaintiffs were not expected to close the deals. The defendant was supposed to do that. That was the construction which the parties themselves placed on their agreement, for the evidence shows that the defendant company purchased two other tracts of land which it "took" from plaintiffs' list, and in both instances defendant made the deal, and option agreements were taken direct from the owners to the defendant company. In these cases the defendant company paid plaintiffs the agreed compensation.

In denying defendant's motion for a new trial the trial court filed a memorandum decision from which I quote:

"The defendant applies to the court for a new trial. It seems to

the court the case turns upon the nature of the case involved, and the real issues to be determined. Is this a case where a broker seeks to recover commission for the sale of land, or, is this a case where one person renders service to another for which the other promises to pay? The defendant in this case treats it as if it were a case where a broker is seeking to recover his compensation. The theory of the case is to be determined by the complaint. It is not claimed the complaint is demurrable. In other words it is conceded the complaint states a cause of action. What is the cause of action? Plaintiffs allege that they had land listed for sale and that the defendant agreed with him that if he took over any of that land he would pay them $1 an acre. This is seen in ¶ 4. True, in ¶ 3, plaintiffs allege they were brokers but this is merely a description of their business. Plaintiffs do not claim to be recovering as brokers, but it is because they were brokers they happened to have land listed. From the evidence it is clear both parties were land brokers and that the defendant, in order to save expense to himself and obviate the expense of maintaining an office force, agreed that if he made use of the lists of plaintiff he would pay them $1 an acre in case he bought any of the land. Of course this was disputed but the jury found this way. Now, he made use of their list and afterwards bought the land. He was not required to buy it from plaintiffs, but they put him on the track. If he did not want to pay them $1 an acre, he should not have made use of the information he got from them. Whether it would have cost him a $1 an acre to have maintained an office force and thus get in touch with the land that was offered for sale is not the question. After finding out from them that this land was for sale and making use of their machinery, good faith required that he make no use of the information unless he intended to pay them for it. Whether he paid too much in this particular case does not concern us. We are not making the contract for the parties. It makes no difference that he bought the land through probate proceedings. . . . Simply because the parties happen to be brokers in land does not make this case a case of broker seeking to recover his compensation. It is a case of one broker doing service for another. This is the cause of action, and there being evidence to sustain it, and the jury having found in favor of the plaintiff, I see no reason why the verdict should be disturbed."

The memorandum decision speaks for itself. It shows that the trial court, in denying the motion for a new trial, did not merely make a formal ruling, but carefully considered the questions presented on such motion. I see no reason for disturbing the findings of the jury, and the ruling of the trial court.

BRONSON, J., concurs.

## On Rehearing.

PER CURIAM. A reargument was ordered. After a reconsideration of the evidence in the light of the reargument the court adheres to the conclusion originally announced.

It stands admitted in this case that the land was not listed by anyone having authority to bind the seller to sell at a fixed price, and that all parties were dealing in regard to it with knowledge that the land would have to be sold through the probate court. It was understood, however, that the administratrix was willing to sell at $25 per acre if more could not be obtained.

If the action be regarded as one for a commission for obtaining the land for the defendants at a given price, it would seem clear that it cannot be maintained; for the plaintiffs did not obtain the land for the defendants at the price indicated. One of them testified:

"We got him (Awes) the bargain and he took it according to the terms that we offered it to him; we brought the purchaser—we brought together the owner of the land and Mr. Awes' company as buyer, and by that we had earned a commission."

The evidence clearly shows that the defendant was unable to and did not buy on the terms on which the plaintiffs say they had the land listed so that they did not earn a commission by obtaining the land for the purchaser at the price stated.

Taking the view of the case which is most favorable to the plaintiffs, that the contract was one whereby the defendants agreed to pay to the plaintiffs $1 an acre for such land as they, the defendants, might take from the plaintiffs' lists, we are of the opinion that the evidence is equally insufficient to sustain a recovery in this action. There were two witnesses who testified for the plaintiffs and both of them, as will

be seen from the evidence quoted below, have defined listing as includ-
ing the price at which the land could be purchased. The following
testimony of the plaintiffs' witnesses makes this element of the con-
tract clear, and it seems to us to be equally clear that in the subsequent
dealings respecting the Mooers's land both parties ignored the list
price. In fact, it seems to us that they did not treat this transaction
as falling within the terms of their service or commission arrange-
ment at all.

The terms of the contract appear in the testimony given by two of
the plaintiffs. Mr. Serumgard testified:

"Mr. Awes met us in the office and the question came up as to some
sort of a working arrangement. Mr. Awes had maintained an office
there the year before and had kept a man. Now, he said to us: 'Boys,
we can just as well work this together the coming season; I won't
keep a man *if you fellows will list up land for me and get me bargains.
I will allow you—I will pay you $1 an acre for all the land I take off
your list.*' At first I demurred to this, but Mr. Lonnevik told him that
would be agreeable to him, and I finally told Mr. Awes the same thing;
that he could go ahead and do that. Then he wanted to know if we had
any land listed, and I had already told him at a previous conversation
about a tract of land that we had listed known as the Mooers's land
. . . and owned by the estate of George Mooers; Mrs. Mooers being
the administrator. We told him that we had that and that *it was a
snap, and that it was listed to us at $25 per acre;* and we looked this
over. Mr. Lonnevik and Mr. Awes went into the other office and looked
it over.

"Q. What do you mean by looked it over?

"A. The listing of the land, description of the land, and the memo-
randum of the improvements and quality of the land, and the buildings,
fences, and so on. We had a memorandum of those things."

On cross-examination he testified that by having the land listed he
meant as follows:

"Q. Mr. Serumgard, what do you mean by having the land listed?

"A. I mean that we would arrange with the owner to have the land
for sale at a fixed price, and that is what I mean by having it listed."

* * * * * * * *

"Q. You didn't have any agreement either with Mrs. Mooers that

if you could get her $25 an acre for the land that you could have any-
thing more than that you obtained for it?

"A. No, sir.

"Q. That conversation between Mrs. Mooers and Mr. Hage was that
Mr. Hage asked her if her land was for sale, and she said she would
be glad to sell it if she could get $25 an acre?

"A. Yes, sir; that we could have it for sale at that figure, she would
take that for it."

Upon redirect examination Mr. Serumgard testified that he had
another interview with Mr. Awes some time during the month of
April; that Mr. Awes came into his office when he was alone and
*"wanted to know about whether we had any snaps,* and I told him
that the biggest snap we had on our list is the Mooers land, and he told
me that as soon as Tom got back they would go out and look at it."

Mr. Lonnevik also testified to the agreement as follows:

"Well, Mr. Awes made us a proposition to ———

"Q. Tell what he said?

"A. To list land for him. He said: 'Heretofore I had had a man
here, but if you gentlemen will work together with me it will not be
necessary for me to keep a man here. You can list up land for me and
I will pay you $1 an acre; any land that you cannot sell, or that I can
find buyers for, any lands that I can use, I am willing to pay you
$1 an acre.

"Q. Yes, and then what?

"A. Well, we made that agreement with him."

He also testified to the fact of Mr. Awes going out to see the land
and to a conversation taking place there as follows:

"Q. What, if anything, did he say while you were doing this?

"A. Well, he thought it was *a snap, $25 an acre.  .  .  .*

"Q. And, now, then, did this memorandum listing that you talk
about state the minimum price that Mrs. Mooers would take for her
land or any price?

"A. I don't remember whether it did or not.

"Q. You know what it was listed to us at, do you?

"A. Yes.

"Q. What was it?

"A. *Twenty-five dollars* an acre."

On cross-examination he testified that they had no listing that would bind Mrs. Mooers unless they sold it first; that "it was listed with the right to sell if we could get *$25 an acre for her.*"

It appears that Mr. Serumgard, one of the plaintiffs in this action, acted as attorney for Mrs. Mooers in securing the license to sell and that he had an understanding with Mrs. Mooers that the land would be sold at not less than $25 per acre. She was to get more if the land went higher. In order not to disappoint her, he personally put in a bid for $17,666.15, which was $25.92 per acre. The defendant on the same day put in a bid of $26.06 per acre and the land was sold to it. From these circumstances it will readily be seen that if the defendant had put in a bid for the land at $25 per acre (at which the plaintiffs claim it was listed with them) it (the defendant corporation) would not have become the purchaser. The defendant bid at a competitive sale and not in reliance upon any listing at a price fixed by the seller, either to the plaintiffs or to anybody else, and the plaintiffs were the competing bidders at the sale.

As a further evidence that the plaintiffs and defendant had abandoned the listing, so far as the sale through the probate court is concerned, and that they did not intend their contract to be applicable thereto, the plaintiff who bid in the land testified that he was doing it *so the land could be sold,* and that "Mr. Awes could have had it from us at the price if it was sold to us."

This would have involved a change in the list price. In other words, if the Awes Company had not bid at the probate sale at all and the bid of Mr. Serumgard, at $25.92, had been accepted, Awes could have had the land at $25.92 or 92 cents per acre above the previous list price. To have consummated the deal, however, the Awes Company, according to the plaintiffs' theory in this law suit, would have had to add $1 an acre for commission to the plaintiffs, making the land cost it $26.92 per acre, instead of $26, including commission if taken under the so-called service contract. We are of the opinion that the contract as proved by the plaintiffs cannot be reasonably construed to embrace an obligation on the part of the defendant to pay a commission on a land purchase that it might make at a probate sale where it would bid in competition with the plaintiffs. It follows that the judgment must be reversed and the case dismissed. It is so ordered.

BIRDZELL, GRACE, and ROBINSON, JJ., concur.

CHRISTIANSON, Ch. J. (dissenting further). The foregoing dissenting opinion was prepared and filed when the views of the majority members were expressed in the opinion written by Mr. Justice Robinson. Afterwards a rehearing was ordered and the case reargued, and, while the majority members adhere to the first opinion, they have deemed it necessary, or at least desirable, to reinforce or supplement it with an additional opinion. The additional opinion quotes certain excerpts from the testimony as a basis for the conclusion that the plaintiffs and defendant, so far as the sale of this particular land was concerned, abandoned the arrangement between them, "and that they did not intend their contract to be applicable thereto."

The transcript of the evidence in this case covers some eighty-five pages of typewritten matter, and, of course, it is impossible to get a correct understanding of the arrangement between the parties or of their understanding of it from a few questions and answers. The question is: What does the entire evidence show that the agreement was, how did the parties understand it, and what did they do under it?

It will be noted that the last sentence in the first quotation from Serumgard's testimony reads thus: "Mr. Lonnevik and Mr. Awes went into the other office and looked it over." The next question and answer were as follows:

"Q. What do you mean by looked it over?

"A. The listing of the land, description of the land, and the memorandum of the improvements and quality of the lands and the buildings, fences, and so on. We had a memorandum of these things."

Lonnevik testified as follows with respect to this matter:

"Shortly after, on that same day, we made the agreement with Mr. Awes, he asked me if we had any lands listed up at that time, and I handed him this list or this description of that land of Mrs. Mooers.

"Q. The memorandum of the listing?

"A. Yes, sir.

"Q. That wasn't signed by Mrs. Mooers, however?

"A. I don't think it was.

"Q. And what did Mr. Awes say then, if anything, when he took it?

"A. Well, he read it over, and he said he was going over to see Mrs. Mooers about it."

Lonnevik further testified that Awes took the memorandum with him and that he never returned it to the plaintiffs.

This testimony most graphically presents the interpretation which the parties themselves placed upon their agreement as applied to this particular tract of land. The interpretation was contemporaneous with the making of the agreement. Immediately after the agreement had been made, Awes asked if they "had any lands listed up at that time, and, he says, 'I want your best snaps, that is your best deals now.'" Lonnevik thereupon handed him the memorandum of the land belonging to the Mooers's estate. There is no contention that there was any misunderstanding as to the actual ownership of this land. Both parties knew that it belonged to the Mooers's estate, of which Mrs. Mooers was the administratrix. They knew that Mrs. Mooers had indicated that she was willing that the land be sold if it would bring $25 per acre. But both parties knew that the administratrix could not fix any definite price thereon. They knew that it could be sold only through proceedings had in the county court; that notice of such sale must be given; that all the world would have an opportunity to bid at the sale, and that the land would go to the highest bidder. The defendant made no objection to the condition of the title. He made no intimation that the land should be excluded from the arrangement just made. He examined the memorandum and retained it, and said he was going over to see Mrs. Mooers about it. The evidence further shows that he did go and see her. Not only did the defendant avail himself of the information thus given, but he also later had the plaintiffs furnish a man and an automobile and take him out so that he could examine the land.

This all took place with the unquestioned knowledge on the part of the defendant that this land belonged to the Mooers's estate, and that in any event title must be procured through a sale by the administratrix in the manner prescribed by law. Can there be any reasonable room for doubt but that when the plaintiffs called defendant's attention to the Mooers' "snap," and when the defendant looked over the so-called list, which contained a description of the land and the buildings and improvements thereon, that both parties assumed that this was within the terms of the working agreement just formulated? Can there be any serious question but that when the defendant later availed himself

of plaintiffs' services in taking him out to examine the land, and locating the boundaries thereof, that both parties assumed that it was one of the deals covered by the arrangement formerly made? I think not. Nor do I believe that there is anything connected with the actual purchase of the land by the defendant which entitles him to say that the deal was not within the terms of the agreement, as intended and construed by the parties.

It should also be remembered (as stated in the former dissent) that in all matters arising between these parties, the defendant closed his own deals with the owners of the lands. He did not require the plaintiffs to do this. He merely "took lands from their lists." It will be noted that in this case he took the so-called list or memorandum, and said, "I will go and see Mrs. Mooers about it." He did go and see her. If the title to the property had been in her name, and if the property had been hers to sell, he doubtless would have closed the deal, the same as he closed other deals for lands "taken from plaintiffs' lists." He did, however, proceed to close the deal in the only way in which it could be done, namely, by submitting a bid to Mrs. Mooers as administratrix. When we consider the character of the title to this land there is no essential difference between what defendant did in this case, and what he did in other cases where he acquired title to lands "taken from plaintiffs' lists." -

The majority members persist in treating the relation between the parties to this action as one between a real estate broker and a person who employs such broker to purchase for, or obtain the sale to, him of certain land at a stated price, on certain fixed terms. In such case, of course, the broker has not earned the compensation stipulated to be paid him unless he makes the purchase, or procures the sale, at the price and on the terms stated. In other words, the broker cannot recover the consideration agreed to be paid him for his service until he has performed the service. But, as already indicated, that was not the relation between the parties to this action, and that was not their contract. Here the plaintiffs did not act as intermediaries in negotiating the sale of land to the defendants. The defendant merely availed itself of the information received from plaintiffs' lists, and whatever services were incident thereto, and negotiated and closed its own deals with the different owners. That was true of every deal that was consummated for land which defendant "took from plaintiff's lists."

As was aptly remarked by the trial court (in the memorandum opinion set out in the former dissent), "We are not making the contracts for the parties." The parties have the constitutional right to make their own lawful contracts. All contracts must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful. Comp. Laws 1913, § 5896. Even a written contract, the language of which is ambiguous or doubtful, may be explained by reference to the circumstances under which it was made and the matter to which it relates. Comp. Laws 1913, § 5907. In interpreting such contracts it is always competent to take into consideration the construction which the parties themselves have placed upon it. 6 R. C. L. p. 852, § 241.

Basing their argument upon the same basic error as to the nature of the relations and contract between the parties, already referred to, the majority members devote considerable space in the additional opinion to the bids submitted respectively by the defendant and by Serumgard. In this connection it is well to note that the defendant said nothing to Serumgard about its intention to put in a bid for the land. He had no way of knowing that defendant would make a bid, unless it informed him. There was, of course, no obligation on the part of the defendant to purchase any of the lands "from plaintiffs' lists." The only obligation it had assumed was to pay $1 per acre for each tract of land it "took" from such lists. While, as I construe the contract between the parties, the bids are of no particular consequence and have no material bearing on plaintiffs' right to recover, it will be noted that the bids of Awes and Serumgard were only a few cents per acre apart. And the evidence shows that the land was listed with the plaintiffs, by Mrs. Mooers, on April 3, 1916, at which time she said she would accept $25 per acre for it. The sale was not made until July 24th. If there were any crops on the land they most likely were put in after the land was listed. And while there is no specific testimony to that effect, it was assumed in questions asked upon the trial that there were crops upon the land; and upon the oral argument it was stated by Serumgard (who argued the case in person), in response to questions of comments made by members of the court, that the bid submitted by Serumgard represented $25 per acre for the land,

46 N. D.—10.

and that the amount in excess thereof represented the value of the seed which the estate had furnished in putting some of the land into crop that spring, and which crops were then on the land. The correctness of that statement was not denied by appellant's counsel.

It is stated in the supplemental opinion that Serumgard acted as attorney for Mrs. Mooers in securing the license to sell. This statement, while in a sense true, is likely to be misunderstood unless explained. Serumgard was not the attorney for the estate. He did not act as Mrs. Mooers counsel in the probate proceedings. It is conceded that another firm of Devils Lake attorneys were in charge of the proceedings for the probate of the Mooers's estate. Serumgard's only connection with it arose out of the listing of the land with the plaintiffs and the proposed sale thereof. In order to make it possible to have the land sold it was necessary to make the sale through proper proceedings in the probate court, Mr. Serumgard, merely prepared the petition for license to sell and the papers incidental thereto. The record affirmatively shows that he did not even prepare the order confirming the sale of the administratrix's deed.

It seems to me that the evidence in this case justified the jury in finding that the agreement between the parties was what they said it was. The parties contemporaneously with the making of the agreement construed it as applicable to the land in controversy. The defendant availed itself of the information given by plaintiffs; and (as in other deals where it acquired lands taken from plaintiffs' lists) it closed the deal therefor,—closed it in the only manner in which it could be closed. And, according to Lonnevik's testimony (see former dissent) Awes, after having purchased the land, recognized that the defendant company was indebted to the plaintiffs for compensation as a result of the acquisition by the company of the land in question.

The case was submitted to the jury, not upon the few isolated questions and answers set out in the per curiam opinion, but upon all the evidence contained in the eighty-five pages of the transcript. The jury saw the witnesses, and heard their story, and under proper instructions, said that the agreement between the parties related to and embraced the transaction in question. The learned trial court, after full reflection, on motion for a new trial said there was sufficient evidence to justify the jury in arriving at this conclusion. In my opinion this

court is not justified in saying that the conclusions of the jury and of the trial court are contrary to, and have no substantial support in, the evidence.

BRONSON, J., concurs.